[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1151 
Jason Larry Roberts appeals an order of the circuit court directing him to pay $12,166.25 in restitution to the parents of Andrea Michelle Danford. Roberts was convicted of criminally negligent homicide, a violation of § 13A-6-4, Ala. Code 1975, for the shooting death of Ms. Danford.[1] The circuit court sentenced Roberts to one year in prison, imposed a $2,000 fine, and ordered him to pay restitution to Ms. Danford's parents (hereinafter "the parents") for expenses they had incurred in cleaning their daughter's automobile ($825) and for various funeral and funeral-related expenses ($11,341.25).
Roberts argues that the parents were not entitled to any restitution because they accepted a $100,000 payment from his insurance carrier in settlement of a potential wrongful-death action, see § 6-5-410, Ala. Code 1975, before the restitution hearing and they had agreed to release all of their claims against him. The circuit court rejected this argument, concluding that the release in the civil case was not a defense to restitution in the criminal case and that no portion of the settlement payment could be attributed to, and therefore credited against, the parents' pecuniary damages that were proven at the restitution hearing. For the following reasons, we agree with the circuit court's conclusion that a previous settlement in a civil case does not necessarily release a defendant from his or her obligation to pay restitution. We also conclude that under the particular circumstances of this case, a setoff of the civil settlement against the pecuniary damages established by the parents at the restitution hearing was not appropriate. Therefore, we affirm the restitution order.
As noted, the restitution order followed the settlement of a wrongful-death claim the parents had asserted against Roberts. Before trial, the parents settled with Roberts's insurance carrier for $100,000 and signed a general release discharging Roberts from liability for
 "any and all claims, demands, damages, costs, expenses, loss of services, actions, and causes of actions arising from any act or occurrence, up to the present time, and particularly [on] account of all personal injury, disability, property damage, loss of services and loss or damages of any kind sustained or that [they] hereafter may sustain in consequence of an accident that occurred on or about the 21st day of November, 1999. . . ."
(Supp. C. 9.)
Roberts does not appeal his conviction. The dispositive issues on appeal concern the legal effect of the civil settlement and *Page 1152 
the release of the parents' civil-damages claim. Roberts maintains that the circuit court erred in ordering any restitution. Specifically, he argues that, because his insurance carrier paid the parents an amount substantially in excess of what they actually claimed in expenses incurred in connection with their daughter's death, the parents suffered no pecuniary loss for which restitution could be made. Stated differently, Roberts argues that the circuit court should have credited the insurance proceeds against the parents' expense claims and, furthermore, that the release barred the court from ordering any restitution. The State contends that the civil settlement and the accompanying release had no effect on the court's statutory authority to order the restitution as part of Roberts's sentence.
The right of crime victims to receive restitution is set forth in the Restitution to Victims of Crimes Act, § 15-18-65 et seq., Ala. Code 1975 ("the Act"). Several sections of the Act are pertinent to our discussion of the issues presented here. Section 15-18-65, Ala. Code 1975, states:
 "The Legislature hereby finds, declares and determines that it is essential to be fair and impartial in the administration of justice, that all perpetrators of criminal activity or conduct be required to fully compensate all victims of such conduct or activity for any pecuniary loss, damage or injury as a direct or indirect result thereof. The provisions of this article shall be construed so as to accomplish this purpose and to promote the same which shall be the public policy of this state."
"Pecuniary damages" is defined in § 15-18-66(2), Ala. Code 1975, as follows:
 "All special damages which a person shall recover against the defendant in a civil action arising out of the facts or events constituting the defendant's criminal activities; the term shall include, but not be limited to the money or other equivalent of property taken, broken, destroyed, or otherwise used or harmed and losses such as travel, medical, dental or burial expenses and wages including but not limited to wages lost as a result of court appearances."
"Victim" is defined in § 15-18-66(4), Ala. Code 1975, as:
 "Any person whom the court determines has suffered a direct or indirect pecuniary damage as a result of the defendant's criminal activities. `Victim' shall not include any participant in the defendant's criminal activities."
Section 15-18-75, Ala. Code 1975, provides:
 "Nothing in this article limits or impairs the right of a person injured by a defendant's criminal activities to sue or recover damages from the defendant in a civil action. Evidence that the defendant has paid or has been ordered to pay restitution pursuant to this article may not be introduced in any civil action arising out of the facts or events which were the basis for the restitution. However, the court shall credit any restitution paid by the defendant to a victim against any judgment in favor of the victim in such civil action.
 "If conviction in a criminal trial necessarily decides the issue of a defendant's liability for pecuniary damages for a victim, that issue is conclusively determined as to the defendant, if it is involved in a subsequent civil action."
Section 15-18-78, Ala. Code 1975, states:
 "(a) A restitution order in a criminal case shall be a final judgment and have all the force and effect of a final judgment in a civil action under the laws of the State of Alabama. The victim on whose behalf restitution is ordered, the executor or administrator of the victim's estate, or anyone else acting on behalf of the victim, shall be entitled to all the *Page 1153 
rights and remedies to which a plaintiff would be entitled in a civil action under the laws of this state as well as any other right or remedy pertaining to such restitution order as may be provided by law.
 "(b) The provisions of this section shall be read and deemed in pari materia with other provisions of law. Provided however, the provisions of this section are cumulative and shall not be construed so as to deprive any victim of any other remedy or relief to which a victim may now or hereafter be entitled pursuant to law."
The legislative purpose underlying the Act, as evidenced by the plain language of § 15-18-65, was to fully compensate victims of crime for "any pecuniary loss, damage or injury" suffered as a direct or indirect result of a criminal act. See Butler v. State, 608 So.2d 773
(Ala.Crim.App. 1992), and Gladden v. State, 644 So.2d 1267
(Ala.Crim.App. 1993). In Ex parte Clare, 456 So.2d 357, 358 (Ala. 1984), the Alabama Supreme Court stated:
 "The Court of Criminal Appeals states that included in the concept of special damages is the right to receive punitive damages. This, however, is incorrect. The purpose of the above-cited statute, as announced by the legislature, is to ensure
 "`. . . that all perpetrators of criminal activity or conduct be required to fully compensate all victims of such conduct or activity for any pecuniary loss, damage or injury as a direct or indirect result thereof. . . .' (Emphasis added.)
 "Code 1975, § 15-18-65 (1982 Repl.Vol.). These special damages, then, are based on the theory of compensation. In Birmingham Waterworks Co. v. Keiley, the Court of Appeals discussed the issue of damages, and stated:
 "`Actual damages are recoverable at law, out of a wrongdoer by the injured party as a matter of right as compensation for the actual loss sustained by him by reason of such wrong. Punitive damages are damages over and above such sum as will compensate a person for his actual loss, and the law permits their imposition, in proper cases, at the discretion of the jury, not because the party injured is entitled to them as matter of right, but as punishment to the wrongdoer, and to deter him and others in similar businesses from such wrongdoing in the future.'
 "2 Ala. App. 629, 637, 56 So. 838, 841 (1911), citing Oliver v. Columbia, N. L. R.R. Co., 65 S.C. 1, 43 S.E. 307 (1902). The legislative intent of the restitution statute is to compensate, and not to punish. We, therefore, hold that the special damages that the victim is entitled to in this case are limited to an amount which fully compensates the victim, and these damages may not be punitive in nature."
Although the purpose of restitution is to effectuate the compensation of a crime victim and although a restitution order has all the force and effect of a final judgment in a civil action in Alabama, it is nonetheless clear that the Legislature intended that restitution remain an integral part of traditional criminal sentencing. Thus, this Court has held that the Legislature, in providing for civil enforcement of a restitution order, did not intend to make restitution a civil action. Restitution is not subject to the requirements of a civil adjudication merely because it is enforceable in the same manner as a civil judgment. See Rice v. State, 491 So.2d 1049 (Ala.Crim.App. 1986).
Furthermore, although compensation to the victim may have been the primary *Page 1154 
purpose of the Restitution Act, it was certainly not the sole purpose. Section 15-18-68(3), Ala. Code 1975, states that "[t]he anticipated rehabilitative effect on the defendant regarding the manner of restitution or the method of payment" is another important criterion for determining the manner, method, or amount of restitution. Thus, one of the practical objectives of the Act is to force a wrongdoer to recognize the consequences of his or her actions and to accept the financial responsibility for those consequences. It is significant, we think, that restitution is fundamentally different from civil damages. The Restitution Act authorizes restitution as an incident to criminal prosecution. See Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907
(Ala. 1992); see also § 15-18-67, Ala. Code 1975 ("the court shall hold a hearing to determine the amount or type of restitution due the victim or victims of such defendant's criminal acts" and "the court shall order that the defendant make restitution or otherwise compensate such victim for any pecuniary damages").
The statutes and cases referenced above, although informative, do not specifically instruct the courts with respect to how a payment to the victim by the defendant's insurance carrier and a corresponding release should affect restitution, if at all. The Restitution Act does specifically permit awarding restitution to a crime victim in addition to any civil remedies that may exist. However, the Act provides that "the court shall credit any restitution paid by the defendant to a victim against any judgment in favor of the victim in such civil action." § 15-18-75; see also § 15-18-78(b), and Moore v. State, 706 So.2d 265
(Ala.Crim.App. 1996). Of course, glaringly absent from § 15-18-75 is a provision authorizing the court to credit a civil settlement or a civil judgment against an amount of pecuniary damages that may be subsequently ascertained in a restitution hearing. This omission apparently prompted this Court in Patterson v. State, 518 So.2d 809 (Ala.Crim.App. 1987), to state:
 "The appellant argues that the trial court improperly denied his trial motion to receive credit for insurance proceeds paid to the victim's parents as a result of a civil settlement on this case citing § 15-18-75. The appellant has presented no evidence other than his allegation in brief that the insurance company paid the victim's family any settlement. Under § 15-18-75 [the] appellant was not entitled to offset the amount of restitution by the amount of the settlement paid, and, furthermore, there was no proof of any civil settlement."
518 So.2d at 816 (emphasis added).[2]
Because the converse of the situation expressly addressed in § 15-18-75 is not discussed in that Code section, or in any other provision of the Act, Roberts argues that we should revisit our decision inPatterson v. State and hold § 15-18-75 to be ambiguous and that we should then construe that section as authorizing the setoff *Page 1155 
that he seeks. On the other hand, the State, arguing that the statute is clear on its face, takes the position that the apparent rationale underlying the aforementioned statement from Patterson v. State, supra, should control here.
Based on our examination of the Act, we conclude that restitution is not a claim that belongs to the victim; it is an important measure that the circuit court is statutorily obligated to employ as part of criminal sentencing — a measure that has both salutary remedial and rehabilitative characteristics. Restitution is a part of the criminal sentence rather than merely a debt between the defendant and the victim. Although one of the purposes of restitution is to make the victim whole, payment of restitution also advances the rehabilitative purposes of sentencing. For these reasons, and because the State was not a party to the release between Roberts and the parents, the release did not prevent the circuit court from ordering restitution to the parents. Private parties cannot settle a civil claim and thereby agree to waive the subsequent application of a criminal statute. Our conclusion in this respect is consistent with decisions from other jurisdictions that have considered this issue. See, e.g., State v. Iniguez, 169 Ariz. 533,821 P.2d 194 (Ariz.Ct.App. 1991); State v. Walters, 224 Wis.2d 897,591 N.W.2d 874 (Wis.Ct.App. 1999); State v. Applegate, 266 Kan. 1072,976 P.2d 936 (1999); Abeyta v. State, 42 P.3d 1009 (Wyo. 2002); Peoplev. Maxich, 971 P.2d 268 (Colo.Ct.App. 1998); and State v. Kirby,818 So.2d 689 (Fla.Dist.Ct.App. 2002). We find the following discussion in People v. Bernal, 101 Cal.App.4th 155, 160-63, 123 Cal.Rptr.2d 622,625-28 (Cal.Ct.App. 2002), to be particularly persuasive:
 "Although the record is ambiguous, it appears that the trial court based its ruling that respondent had satisfied his restitution obligation on the probation report, which stated: '[T]he defendant may be relieved of any restitution owed through probation if the victim signed any waiver forms from defendant's insurance.' The trial court received a release signed by Russell `with respondent's name on it.'
 "We agree with appellant's contention that the written release did not abrogate respondent's restitution obligation because (1) a release by a victim cannot waive the People's right to have a defendant pay restitution ordered as part of his sentence, [and] (2) the victim would be in an untenable position if he or she had to reject a settlement offer from a defendant's insurance company that covers only a portion of the victim's losses in order to preserve the uncertain possibility that the full amount might be recovered from the defendant . . . .
". . . .
 "A restitution order has objectives beyond simply indemnifying the victim. It also seeks to rehabilitate the defendant and deter [the] defendant and others. (People v. Crow (1993) 6 Cal.4th 952, 957, 26 Cal.Rptr.2d 1, 864 P.2d 80.) `Among other things, California's restitution law ensures that amends are made to society for a breach of the law, serves a rehabilitative purpose, and acts as a deterrent to future criminality. [Citations.] Restitution "is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused. Such a penalty will affect the defendant differently than a traditional fine, paid to the State as an abstract and impersonal entity, and often calculated without regard to the harm the defendant has caused. Similarly, the direct relation between the harm and the punishment gives restitution a more precise deterrent effect than a traditional fine." [Citations.]' (People v. Moser (1996) *Page 1156 50 Cal.App.4th 130, 135-136, 57 Cal.Rptr.2d 647.)
 "While a settlement agreement with, and release of, a defendant's insurance company may reflect a victim's willingness to accept the amount paid in full satisfaction for all civil liability, it does not reflect the willingness of the People to accept that sum in satisfaction of the defendant's rehabilitative and deterrent debt to society. A restitution order pursuant to a defendant's plea is an agreement between the defendant and the state. (People v. Pitts (1990) 223 Cal.App.3d 606, 872, 273 Cal.Rptr. 757.) The victim is not party to the agreement, and a release by the victim cannot act to release a defendant from his financial debt to the state any more than it could terminate his prison sentence.
 "Furthermore, the amount ordered as restitution need not mirror what a victim might obtain in a civil action. `There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. . . .' (People v. Carbajal (1995) 10 Cal.4th 1114, 1121, 43 Cal.Rptr.2d 681, 899 P.2d 67.) Since the categories of loss recoverable by restitution and the dollar amounts ordered are not identical to the defendant's civil liability, there is no reason that a release of civil liability should release a restitution obligation, just as a satisfied restitution obligation does not bar a civil action for further damages. . . .
 "As appellant points out, even the statutory goal of fully reimbursing the victim's losses might be undermined if a civil settlement with a defendant's insurance carrier barred further restitution. A victim might rationally choose to accept an insurance settlement for substantially less than his or her losses rather than risk the uncertain, or even unlikely, possibility that the defendant will pay the entire restitution amount. If a settlement release automatically terminated a defendant's restitution obligation, the victim would lose all possibility of ever being made whole."
(Footnotes omitted.)
As noted initially, the primary purpose of the Act is to effectuate the full compensation of the victim for certain pecuniary damages, as defined in § 15-18-66(2). Obviously the Legislature's objective was to ensure that the victim could receive full compensation for certain losses as part of the criminal sentencing proceeding. However, in creating a procedure by which to "fully compensate" a victim, the Legislature arguably did not intend for the victim to receive more compensation from the defendant than would actually satisfy the stated goal of full compensation, at least within the limits defined in the Act. Another, and perhaps more difficult question courts in other jurisdictions that have similar restitution acts have recognized concerns the amount of restitution that is statutorily authorized when the victim has already received some compensation in a civil proceeding. By way of example only, we quote from State v. Walters, supra, in which the Wisconsin Court of Appeals addressed the issue thusly:
 "In determining the amount of restitution, a court may require a defendant to pay only special damages sustained by the victim, which are substantiated by evidence in the record. A court is prohibited from ordering restitution for any general damages of the victim. Section 973.20(5)(a), Stats.; State v. Stowers, 177 Wis.2d 798, 804-05, 503 N.W.2d 8, 10
(Ct.App. 1993). This limitation restrains the circuit court from assessing restitution for damages intended to generally compensate the victim for such things as pain and suffering, anguish or humiliation. *Page 1157 Id. However, any readily ascertainable pecuniary expenditure paid out because of the crime is appropriate as special damages. Id. Medical expenses and lost earnings are types of special damages. Id.
at 805, 503 N.W.2d at 10.
 "A restitution order does not limit or impair the right of a victim to sue for civil damages; however, the amount of restitution paid to a victim in a criminal proceeding may be a setoff against a like amount in the judgment in a companion civil case. See § 973.20(8), Stats.; Olson v. Kaprelian, 202 Wis.2d 377, 383, 550 N.W.2d 712, 715 (Ct.App. 1996). No Wisconsin appellate case has directly addressed whether a payment in a civil case can be a setoff against either the total amount of special damages found by the court or against the amount of restitution ordered at the conclusion of a restitution hearing. The supreme court indicated in [State v.] Sweat[, 208 Wis.2d 409, 561 N.W.2d 695 (1997),] that a setoff is appropriate for the circuit court to consider, but it did not discuss how to apply it. In addressing this choice, we consider where a setoff will best promote the State's dual purposes of achieving its penal objectives and making the victim whole for the special damages sustained. We conclude that those legislative objectives will be best served by applying any setoff which a circuit court determines is appropriate to the total amount of special damages which the victim has sustained.
 "But how does the circuit court determine whether a setoff of any amount is appropriate? In [State v.] Behnke[, 203 Wis.2d 43, 553 N.W.2d 265 (Ct.App. 1996)], we examined a defense raised to limit the amount of the victim's medical expenses which the defendant could be ordered to pay. We declined to make the reduction Behnke requested because we determined he had the burden of establishing facts sufficient to justify the circuit court's lowering the amount of medical expenses he should be required to pay, and he had failed to meet that burden. We explained that:
 "`[B]efore the trial court can accurately assess a defense recognized by our law of civil litigation, the defendant must present a tangible record with which the trial court can exercise its discretion. Here, while Behnke articulated his dual legal theories, he did not point to any specific facts from which the trial court could have grounded the downward adjustment he desired.'
 "Behnke, 203 Wis.2d at 58-59, 553 N.W.2d at 272-73. The allocation of the burden of proof in a restitution proceeding because of payments made in a companion civil proceeding has not been addressed by a Wisconsin appellate court, but it has been addressed by federal courts under the Victim and Witness Protection Act (VWPA), on which Wisconsin's restitution statute is based, in part. For example, in United States v. Sheinbaum, 136 F.3d 443 (5th Cir. 1998), the court concluded that because the defendant had the strongest incentive to litigate whether a setoff should be afforded during a restitution proceeding, the burden of proof on that issue should lie with the defendant. Id. at 448. We find the reasoning of Sheinbaum
persuasive. Therefore, based on Behnke and the reasoning from Sheinbaum, we conclude that Walters had the burden of proving facts sufficient to prevail on the defense she raised, that of setoff. Because Olivas suffered general, as well as special damages, that burden required Walters to prove what part, if any, of the $25,000 payment made to Olivas was paid for special damages.
 "At the restitution hearing on February 6, 1998, the circuit court found that Olivas had proven $40,835.17 in special damages. In reasoning whether some *Page 1158 
part, or all of the $25,000 should be deducted from that amount, the circuit court stated:
 "`There is a second issue raised and that is whether the amount of settlement paid previously to the Olivases by Ms. Walters should be deducted in some manner from that total [special damages]. . . .
 "`You could say that [settlement] money was all applied to the expenses, but it is really, it's kind of mixing apples and oranges.'
 "The circuit court considered whether some of the $25,000 was paid for general damages, which the court found had been incurred, but for which damages the record was insufficient to determine their amount. It also considered whether a setoff of the $25,000 was due against the total amount of Olivas's special damages; or whether a setoff of that payment against some combination of the two types of damages was warranted. It reasoned that because the testimony had established general damages of an indeterminate amount, it would be unfair to make a setoff of the $25,000 settlement entirely against Olivas's special damages.
 "We conclude the circuit court was correct in refusing to make a setoff. Walters had the burden of proving what portion of the $25,000 payment was made for special damages, because in this case the record before the court showed that Olivas had suffered both general and special damages. However, Walters provided no such proof; therefore, the circuit court had no choice but to conclude that none of the payment should be applied against special damages. Accordingly, we affirm the $24,000 of restitution ordered."
224 Wis.2d at 905-09, 591 N.W.2d at 877-79 (footnote omitted). For other examples of how appellate courts have approached this issue, see Statev. Iniguez, supra; State v. Applegate, supra; State v. Belfry,416 N.W.2d 811 (Minn.App. 1987); People v. Salas, 42 P.3d 68 (Colo.App. 2001); but see People v. Clifton, 172 Cal.App.3d 1165, 219 Cal.Rptr. 904
(Cal.App. 1985).
Roberts argues that his $100,000 settlement payment to Ms. Danford's parents, which compromised the parents' wrongful-death claim, must be deemed, as a matter of law, to have fully compensated the parents for the pecuniary loss found by the circuit court at the restitution hearing. However, we find it unnecessary to address in this case the application of cases like Walters to Alabama's Restitution Act. As noted, those cases dealt, at least in part, with the problem that arises in determining the amount of restitution that is authorized by statute when the victim has already received some compensation in a civil proceeding. However, the Alabama Supreme Court has consistently held that the only damages that may be awarded by a jury under Alabama's wrongful-death act are punitive damages. See generally the cases collected at 20 Ala. Digest 2d Death
§ 93 (1994). Unlike the remedial and rehabilitative purposes underlying restitution in criminal cases, civil damages for wrongful death serve only the purposes of punishing the wrongdoer and deterring others from engaging in similar conduct. In Alabama, damages awarded in a civil wrongful-death action do not compensate.[3] *Page 1159 
Because only punitive damages are recoverable in a wrongful-death action, it is reasonable to conclude that Roberts and Ms. Danford's parents understood that the $100,000 payment made by Roberts's insurance carrier was in satisfaction of, and therefore compromised, a claim that could have resulted in an award of only punitive damages. In fact, such a conclusion is dictated by the fact that society is viewed to be the true plaintiff in a wrongful-death action. Because there is no private interest involved with respect to the plaintiff, only a public interest, the only private interest is that of the defendant. Because punitive damages are not to compensate a victim for loss but to punish and deter, the State alone is considered the true plaintiff in a wrongful-death action, and in seeking punitive damages a plaintiff acts not as a victim, but as an agent of legislative appointment for declaring the public policy evidenced by the wrongful-death act. See Maryland Casualty Co. v.Tiffin, 537 So.2d 469 (Ala. 1988); Geohagan v. General Motors Corp,291 Ala. 167, 279 So.2d 436 (Ala. 1973).
In Tatum v. Schering Corp., 523 So.2d 1042 (Ala. 1988), the Alabama Supreme Court recognized this and held, at least implicitly, that the monetary settlement of a wrongful-death claim is characteristically punitive in nature even though not characterized as such by the parties. Writing for the Court in Tatum, Justice Maddox stated:
 "In this case, if the plaintiff proves to the jury that the total amount of the punitive damages that should be assessed against the joint tort-feasors exceeds the sum of $450,000, then the $450,000 that the plaintiff has received by way of pro tanto settlements would be a partial satisfaction of the total amount determined by the jury. On the other hand, if the jury determines that the total amount of the plaintiff's punitive damages for the homicide is an amount equal to or less than $450,000, then, in that event, the plaintiff is entitled to recover nothing from alleged joint tort-feasor Schering Corporation, because the plaintiff will have already had his recovery satisfied by the payment of the $450,000 pursuant to the pro tanto settlements."
523 So.2d at 1045. Dissenting in Tatum, Justice Houston was more direct: *Page 1160 
 "Since wrongful death damages have been interpreted as being only punitive by prior decisions of this Court, it is evident that the parties to the releases intended for the $400,000 from Mrs. Tatum's physician and the $50,000 from the drug manufacturer to be punitive damages. Therefore, this should have no effect on any compensatory damages or punitive damages that a jury may award against Schering in the trial of this case."
523 So.2d at 1063 (Houston, J., dissenting). Former Chief Justice Torbert agreed in part with Justice Houston's dissent, noting:
 "I agree with Justice Houston's dissent, except that if his view had prevailed, that is, if this Court had been persuaded to allow recovery of compensatory damages for wrongful death, I would not have applied that new holding to this case, but would have applied it only prospectively. I believe that a prospective only application would be necessary because two of the three defendants in this case have settled the claims against them based upon the rule that only punitive damages were recoverable. To change the rules in the middle of this litigation would unfairly place the burden of any award of compensatory damages solely on the shoulders of Schering Corporation, while still leaving that defendant liable for punitive damages."
523 So.2d at 1046 (Torbert, C.J., concurring in part and dissenting in part).
It is clear that had the parents filed a wrongful-death action against Roberts and obtained a judgment based on a jury's verdict of $100,000 in punitive damages for the wrongful death of their daughter, no portion of that judgment could be set off against the restitution ordered by the circuit court, even if § 15-18-75 were construed, as Roberts urges, to allow a civil judgment or civil settlement to offset against a subsequent restitution award. We see no logic in concluding, and, indeed, we can find no provision in the Act suggesting, that the Legislature could have intended to allow such a setoff merely because a defendant had the foresight to obtain liability insurance and was successful in negotiating the settlement of a claim for which only punitive damages were recoverable. We certainly appreciate the facial appeal of Roberts's argument — that the parents could simply reimburse themselves for their pecuniary loss from the settlement proceeds. The $100,000 settlement paid by Roberts's insurance carrier to the parents, as Roberts points out, was substantially in excess of the sum that would compensate them for their actual loss. In that sense, the settlement payment was fortuitously compensatory. However, the same can be said of all punitive-damages awards in civil cases. See Ex parteClare, supra, at 358. That is inherent in the historic dichotomy between compensatory and punitive damages — the purpose of punitive damages is to punish and deter undesired conduct and the purpose of compensatory damages is to compensate the injured party for the injury incurred. This dichotomy is clearly evident in this case. In pursuing their wrongful-death claim to a successful settlement, the parents, acting ostensibly on behalf of the State in pursuing a wrongful-death claim, accomplished the policy goals underlying the wrongful-death act — Roberts, through his insurance carrier, was made to pay a substantial sum of money in recognition of, and as punishment for, his actions in causing the tragic death of Ms. Danford. Although that substantial sum may be fortuitously compensatory, in the sense that the parents may spend it as they wish, under Alabama law the payment of that settlement is not considered to have compensated the parents and, thus, it did not negate the mandatory *Page 1161 
requirement of the Act that the parents be fully compensated for their pecuniary damages. Under the Act the parents are by definition victims of Roberts's criminal negligence.[4] The circuit court was statutorily authorized to order restitution in an amount that would fully compensate them, as victims, for their pecuniary loss — compensation that, we note, is authorized only by virtue of the Act.
For the foregoing reasons, the circuit court's restitution order is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] The evidence adduced at trial indicated that late in the evening of November 20, 1999, Roberts shot and killed Ms. Danford while she was driving her automobile. Roberts, a backseat passenger in Ms. Danford's automobile at the time, testified in his defense that he was moving his gun from his lap when the gun accidentally discharged. Stacey Truitt was riding in the automobile with Ms. Danford and Roberts. Truitt testified that Ms. Danford twice told Roberts to put the gun away and told him that "[i]f you were a real man, you wouldn't need a gun." (R. 123.) Roberts also testified that Ms. Danford did not like his having the gun in her automobile and that he was putting the gun away when it discharged. He could not explain why the gun had discharged.
[2] This Court has also held that a defendant is not entitled to offset the amount of restitution ordered by the amount that may have been paid to the victim by the victim's insurance carrier. See Varner v. State,497 So.2d 1135 (Ala.Crim.App. 1986) (discussing the application of the collateral source rule to the law of criminal restitution); and Harrisv. State, 542 So.2d 1312 (Ala.Crim.App. 1989). In a similar vein, this Court has held that a defendant is not entitled to offset the amount of restitution ordered by the amount the victim may have received from the defendant's accomplice in settlement of a civil action. Butler,608 So.2d 773. In light of the collateral source rule, these cases stand for the proposition that a wrongdoer cannot benefit by offsetting the amount of his restitution obligation by the amount of a payment made to the victim, if the payment is not made by or on behalf of the wrongdoer.
[3] In a dissenting opinion in Alabama Power Co. v. Turner,575 So.2d 551, 560 (Ala. 1991), Justice Houston noted:
 "A commentator has correctly described the interpretation given our wrongful death act by a majority of this Court:
 "`In Alabama an action for wrongful death, if successful, results in an award of punitive damages only. For this reason, the plaintiff may not argue, nor may the jury consider, evidence tending to show that the decedent had an expected lifetime income of any particular amount; that the decedent was exceptionally healthy or sickly; that the death caused someone to incur the expenses of an autopsy, a funeral, and a burial; that lost spousal, parental, or filial consortium had any value; or any other aspect of the decedent's life to which a value might be attached. Rather, the award serves only to further the avowed purposes of punitive damages generally — punishing the defendant, affording a measure of retribution, and deterring others from engaging in conduct similar to that which brought about the decedent's demise. In that sense, the plaintiff acts as the agent of the State, a private district attorney, to vindicate an interest of society and to seek retribution for a harm done to the people. Further, the plaintiff cannot seek, in any measure, compensation for the family or the estate of the decedent. Thus, any award received by the estate is fortuitously compensatory, not intended or designed to be that way. Because only society's interests are sought to be vindicated in wrongful death actions, and because the victim's estate has no right to be compensated for its loss, the assumption that society reaps the benefit of the jury's award is theoretically sound.'
 "L. King, On Civil Punishment and Tort Reform in Alabama, 20 Cumb. L.Rev. 47, 49-51 (1989) (emphasis original)."
In King v. National Spa Pool Institute, Inc., 607 So.2d 1241, 1247
(Ala. 1992), the Alabama Supreme Court noted that "[p]unitive damages are not compensation, and our system should not be contorted to treat them as such."
[4] Although it is not argued otherwise, we note that under Alabama caselaw the parents are clearly "victims" within the meaning of § 15-18-66(4), and that the expenses they claimed fall within the definition of "pecuniary damages" contained in § 15-18-66(2). SeeButler v. State, supra; and Harris v. State, supra. *Page 1162